The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Raylene D. Grishow presiding. Good morning, everyone. We are going to call case number 4250293, People of the State of Illinois v. Stephen Christopher Pettaway. Would counsel for the appellant please state your name for the record? Good morning, Your Honor. My name is Cecilia Landor. And counsel for the athlete, would you state your name for the record? Yes, John Barrett for the People of the State of Illinois. Wonderful. Thank you. All right, counsel, you may proceed. Thank you, Your Honor. Good morning, Your Honors. My name is Cecilia Landor, and I represent Defendant Appellant Stephen Pettaway. Mr. Pettaway's waiver of counsel in this case was neither freely made nor unequivocal. And because reviewing courts should make every reasonable presumption against finding a waiver of counsel, this court should reverse the trial court's finding that Mr. Pettaway had indeed waived counsel. First, courts have to determine that a defendant truly desires to represent himself and that he has clearly and unequivocally invoked the right to self-representation. And every reasonable presumption must be taken against the validity of that waiver. So reviewing courts look at the overall context of the proceedings to ensure that the defendant truly desires to represent themselves. And part of this calculus involves a determination of whether the defendant is trying to achieve a different purpose through their self-representation. So, for example, in Burton, the defendant wanted access to certain records, and he told the court that he would be prepared to represent himself if his attorney could not access them for him. And that court found that the defendant had not clearly and unequivocally invoked his right to self-representation because he had only indicated a quote-unquote conditional willingness to represent himself. Similarly, there's an Eighth Circuit case called Reese v. Nix, and there the defendant asked for new counsel. He was denied it, and he impulsively announced that he did not want counsel. And on appeal, this was found to not be a clear and unequivocal invocation of the right. In Mr. Pettaway's case, the idea of representing himself was a suggestion made by his second attorney, and only once the suggestion had been made several months into the proceeding does the issue of Mr. Pettaway going pro se appear on the record. Mr. Pettaway and his lawyer were having a clear breakdown in communication and in the attorney-client relationship, and it's not simply about taking Mr. Pettaway's word for it. Both parties testified to their difficulties working together. Counsel suggested specifically that Mr. Pettaway go pro se, which seems quite for a public defender to do. He told him using an expletive that he didn't care if he won or lost. He rarely visited him. He said on the record that Mr. Pettaway was one of, if not the most difficult clients he'd ever had, and he eventually filed a motion to withdraw. Despite that, Mr. Pettaway did not want to represent himself. He felt that counsel did not want to represent him, given those facts I just shared. Mr. Pettaway specifically felt that, you know, his counsel was not going to be successful representing him at trial. He hadn't gone over relevant audio and video footage with him. He didn't give Mr. Pettaway relevant motions. He failed to explain case law to him, and Mr. Pettaway's own comments to the judge at multiple court dates, and both before and after being admonished about his waiver of counsel, showed that he felt like counsel did not want to represent him. And like anyone, Mr. Pettaway wanted to go to trial with someone who felt like they could confidently try the case. So counsel told him to just represent himself, that he didn't care if he won or not. Mr. Pettaway told the court, it's beyond obvious that he's not for me at all, and he emphasized numerous times that he did in fact want counsel. He said, I want to be I want proper representation. I have that right. He repeated multiple times that he wanted effective counsel, and he felt like counsel. Is there any blame here to be put on Mr. Pettaway? I thought the record showed for several times he refused to meet with both the first and the second attorney. They tried to meet with him. They tried to go over a discovery. They tried to discuss stuff with him, and he wouldn't meet with them. Absolutely, and I think that, you know, both attorneys, I think specifically the second attorney, described those issues that he had with Mr. Pettaway on the record. And, you know, if Mr. Pettaway can be described as dramatic in some instances, that does not negate his right to counsel, nor that every reasonable presumption must be taken against his waiver. And, you know, certainly there are times on the record where we can see, as you're describing, you know, the difficulty that Mr. Pettaway had with both of his counsels. But I think what I would just emphasize is really the breakdown in the relationship between his second counsel. So it wasn't just Mr. Pettaway, I think, who, you know, had this frustration. His second counsel, you know, said he was too intimidated to come visit him. And while he had attempted to go over some discovery, I think the fact that he wasn't able to have a heard really contributed to the breakdown in their relationship. So I think, you know, from Mr. Carter, the second attorney's testimony on the record, it seems that this was an issue between both of them. And from counsel's motion to withdraw, we can see, you know, he just as much did not want to represent Mr. Pettaway. But counsel, Justice Grisho is hit upon something, and I don't think that we need necessarily not consider the relationship with the first attorney. Was it Perry? Not uncommon for criminal defendants to have issue with court-appointed attorneys because there's this sentiment oftentimes that they're a part of the system because they were appointed by the court. So what we see is Perry is really textbook. Goes to the jail, has a bad day with defendant, comes back the very next day, okay, let's get back to work. Your client completely resistant to working with that first attorney. So the point of my inquiry is we don't have to look at this in a vacuum as to just to Carter. We know that the defendant in this case was very resistant to cooperation with counsel. I think, you know, Your Honor has definitely touched on something accurate where, but I think the issue that I see in this case is that Mr. Pettaway should have been given more time. So in the cases of Mayo and Baez, you know, the defendants there expressed that they either wanted a new attorney or they wanted to go pro se. And the trial courts there did what I think they should have done here, which was to take every reasonable presumption against the validity of that waiver and say, why don't you go back, you know, we'll give you a little bit. And I think that's what should have happened here rather than Mr. Pettaway being required to represent him at trial only six days later. But isn't the trial judge best place to make these decisions? The trial judge is having interaction with the attorneys and the defendant in open court getting a sense for the process. Hard for us to take these decisions out of the trial judge's hand. These cases aren't infinitum. They must be resolved. And for the most part, trial judges are pretty, pretty forgiving on these issues when it comes, quite frankly, they prefer defendants have counsel. For sure. And I think, you know, just looking at the case law, it seems like this case was kind of an aberration and for a couple of reasons. I think the first is because of the substitution of judge. So that him going pro se happened really quickly after that substitution of judge. And I wonder if that it would have happened as quickly if the judge, the first judge had been there. And I think, second of all, it seems like in the case law, there is, you know, a lot of just about this presumption against every sorry, a presumption against the finding a waiver of counsel. Because, you know, you look at Mayo, Baez, Rosho, Reese versus Nix, all of these, it feels like all of the trial courts kind of did what should have been done here and say, we're not going to allow you to do this just yet. We're going to either, you know, give you some more time to meet with your attorney, you know, potentially appoint a third attorney, although that seems, you know, very, you know, unlikely in the world of public defense, or, you know, give him some more time to review the evidence. But in terms of what the trial courts, you know, I think they had a few different options here or two, you know, it could be limited, this case could be limited on its facts as well. I think that it seems like something different happened here than what usually happens in the trial courts. And but I do think the trial court had a few different options of what to do. Ms. Lander, I want to direct your attention to the hearing on Attorney Carter's motion to withdraw, which I believe that occurred just prior to trial, the hearing did. And against the backdrop of the trial court, needing to determine whether or not a defendant's request to proceed without representation was clear and unequivocal, I want to review some of the the transcript with you. The court indicated, I'm not implying to grant the motion to withdraw, we're set for trial in six days, let's just do the trial. And then defendant is saying, Your Honor, I want to go listen, the day of trial, which would have been March 19 of 2024. He said, I wanted to go pro se without him, and I wasn't allowed to. And then there's a little more back and forth. And the court then says, well, at this point, Mr. Petaway, you're asking to proceed pro se. And Mr. Petaway says, Yes, sir. There's further back and forth. The trial court then provides Rule 401A admonishments. There are additional exchanges between the court and Mr. Petaway. And he says, the court then concludes, Okay, so you're insisting on representing yourself and defendant says, Yes, sir. So two very direct inquiries by the court, do you want to proceed pro se? And the defendant very clearly responding Yes. So how is that not a clear and unequivocal request to proceed pro se? Of course, Your Honor. So just a couple points in response to that. First, his, although this was at the date of his second intended trial, his attorney, Mr. Carter had suggested that he go pro se all the way before the first intended date of trial. So that was on page R-477. So this has clearly already been kind of percolating in his head that his attorney had suggested this and you know, while they were having this difficulty in communication. I think also the second point I'd like to make is that the law requires that reviewing courts look at overall context of the proceedings to ensure that the waiver is clear and unequivocal and that the defendant truly wants to represent themselves. And I think looking at the entirety of the record here, it just simply doesn't show that or can't support that that Yes, sir was an unequivocal request. You know, he, when you look at cases where someone is, they do make an unequivocal request, you know, they've been asserting this much, you know, much at an earlier time in the proceedings. And the fact that he was asserting this right before trial, I think, cuts, first cuts against the unequivocal nature of it, according to Burton, because it's so close in time. So in Rosho, just to get, sorry, a little into the case law, in Rosho, the defendant wanted to go pro se two weeks before trial. And the court said that was too short a time. And, you know, the fact that it was kind of made on the eve of trial at the 11th hour kind of contributed to the equivocal nature of the request. And so here, I would say, kind of the same thing, there's a sort of a timeliness factor. And I think also looking at the overall context of the proceedings, you know, this Yes, sir, it actually it came right after Mr. Padaway says my attorney couldn't pay me to represent him myself. And I think that kind of echoes in Reese versus Nix, this kind of knee response, I'm really frustrated, you know, he's obviously really frustrated. And he, you know, in in between this, in this dialogue or colloquy with him and the judge, he says repeatedly, you know, I want representation, I want effective counsel, you know, in the admonishments, he said, I'm scared to death to go to trial with this man. So we can see, you know, even up until the admonishments and through them, he's really wavering. And he's, he's not saying I 100% want to go pro se, he's, it really feels like he's agreeing, you know, sort of with a gun to his head to go pro se, because he doesn't feel like he has a choice. And he even says, I don't have a choice, I feel. And so I think the context shows and kind of that knee jerk response to his frustration, that this really wasn't unambiguous, you know, when he just says, Yes, sir. But that's pretty subjective, right? I mean, he's got competent counsel. And he's got a decision to couple decisions, you can ask for new counsel, he can go to trial with his counsel, he can ask to go pro se, you're really arguing the subjective sort of fears of defendant, he's only got a right to competent counsel. Well, your honor, I might disagree a little with that characterization, just because I think, you know, his counsel was also expressing that he didn't feel like he could represent Mr. Petaway, you know, he was actually afraid of Mr. Petaway, but Mr. Petaway, you know, hadn't really done anything to create like a credible fear in counsel, he just counsel hadn't come to visit him in between, you know, the first intended trial and their their next status date. And counsel, you know, even filed a motion to withdraw, which I think for Mr. Petaway would signal, oh, this, you know, person really doesn't want to represent me, they really don't feel able to represent me. And, and I think Mr. Petaway did as best he could, by, you know, asserting his right to he knew he had a right to counsel, and a right to representation. And I think, just kind of to, he is an unsophisticated litigant, you know, he is not able to assert, you know, like, or identify what could have or should have happened. And so I think the trial judge in this situation could have made a few different choices, but I've already kind of touched on giving him some more time, asking, you know, the attorneys asking them to kind of come together and see if they were able to, you know, build a stronger connection, or giving Mr. Petaway more time himself just to go over the evidence. Because part of the issue was that his attorney hadn't, you know, presented some of the evidence to him, and he wasn't really given that much time to go over it over trial before trial. But I do believe going back to the transcript, there was dialogue between the court and Mr. Petaway. He said, you've had discovery for a while, you've went over it, and Mr. Petaway agreed. And then the court says, I don't want you to feel like you don't have a choice, you have the right to have an attorney. And then they go through all the admonishments. I mean, so I guess I disagree with you in that it was he didn't know what he was doing. The court went through everything with him, he could have said, Okay, I need a continuance. The court, I think would have done it. He continued the case numerous times due to all the difficulty with both attorneys. So absolutely, no. And I think it's, I think, just looking at page R584, this, when the judge says, I can appoint a lawyer, I'm happy to keep Attorney Carter, and he's kind of offering different options. And I think, you know, Mr. Petaway had already felt like there was not a possibility with his relationship with Mr. Carter in kind of becoming a positive one. And so for the judge to say, you know, I'm, I'm finding he hasn't been ineffective, you guys can work this out. I think Mr. Petaway probably felt like, well, how, what is there to work out? You know, he filed a motion to withdraw. And, and I think, you know, to look at just the language of the court saying, you know, if you're insisting on proceeding pro se, and how he's kind of saying, if you're insisting on proceeding pro se, or if you want to keep Attorney Carter on, and to that, then Mr. Petaway says, No, he couldn't pay me to represent him. And then he says, Yes, sir. So it feels like I think that's kind of the, you know, there feels like a little bit of a maybe browbeaten factor there, where he feels like he doesn't have a choice, maybe he doesn't know what the other options are, just, you know, because he's not a lawyer or a sophisticated litigant. But to me, kind of going back to, you know, just earlier on that page, he says, I want an effective counsel. And I think he's attempting to assert this right. And really, it's the fact that on the same page, he's saying that he wants an effective counsel just shows that this is not an unequivocal request. It's really very equivocal. And he's, you know, similar to a number of the cases we cited he Rasha, for example, there are these kind of dueling requests, I mean, Rasha, that was considered, it wasn't unequivocal enough, they said, if you want to go pro se, or if you want to have a lawyer, those like these, you're bringing up both of these things. And the, the waiver of the right to counsel has to be completely unambiguous and clear. And here, it just wasn't to that level that is required, I believe. So what was the court supposed to do? The court went through all the admonishments with the defendant, you're saying there should be something else that this court needs to do. So I think the court did have a few different options. I think that it could have, you know, I could have told Mr. Pettaway, I think potentially, if it had been the first judge, I think the first judge was kind of would give was giving them some time to kind of sort out their relationship. And I think potentially, like I talked about the second judge coming in, maybe hastened some of that. But I think, you know, the court could have said, I'm going to give you more time to talk about it. I'm, they could have potentially appointed a third lawyer, because Mr. Pettaway was saying, you know, I do want this, his lawyer was saying, I basically don't think I can work with this man. Or he could have given Mr. Pettaway, you know, a little bit more time to go pro se by himself, and to, you know, have more than six days to just go over the evidence. I just like to make one last point on distinguishing Belk, the case the state uses. In Belk, the defendant retained private counsel in this case, really deals with the rule around retaining private counsel. So in that case, the defendant, it seems like he couldn't afford to maintain his private counsel and his private counsel withdrew and the defendant signed that withdrawal, which stated he understood he must obtain counsel within 21 days, or he would be required to go pro se. So this case deals with a different rule, which is, if a defendant is financially able to engage counsel, but they fail to do so within a reasonable amount of time, that failure may be treated by the court as a waiver of the right to counsel. So it's really different, a really different kind of posture than this case, where the Belk defendant was pro se actually through, you know, much of the proceedings, and had the opportunity to have a public defender appointed and rejected that, whereas Mr. Pettaway was represented throughout the entirety of the proceedings and, you know, asserted his desire to be represented. Thank you, your honors. Thank you. Counsel for the appellee. Thank you. Good morning, your honors and counsel. May it please the court. Yes. The issue before this court is not whether defendant made a wise choice in representing himself. The issue is whether the trial court abused its discretion, acting arbitrarily, fancifully, or unreasonably, and honoring that choice after defendant engaged in a sustained eight-month campaign to make representation by counsel impossible. The trial court went to extraordinary lengths to accommodate this defendant. It appointed new counsel when it was not required to do so. It granted multiple continuances for defendant to reconsider his options. It conducted extensive colloquies about his rights. Defendant responded to these accommodations with systemic obstruction, personal attacks, and manufactured complaints designed to create appellate issues. I just want to jump into the standard of review here and discuss that in a little more depth because I think defendant in his brief sort of glossed over that or kind of swept the standard review a little bit under the rug. So, rather than demonstrating the trial court acted arbitrarily, defendant had cherry-picked his own self-serving statements from the record like I was scared to death or I had no choice and focuses on those little isolated statements rather than looking at the eight months of conduct and obstruction that occurred throughout the proceedings. And that's not how this standard review works. The trial court observed defendant's demeanor across multiple hearings. The trial court heard directly from two experienced public defenders about his refusal to cooperate with them. Judge Clifford presided over hearings on June 14th and August 23rd, August 28th, March 19th, May 2nd before ultimately recusing herself because defendant had made threats against her and she wanted the appearance of impropriety sort of remove that from these proceedings. So, Judge Swift then conducted his own extensive inquiry on May 22nd, or I'm sorry, May 21st and then June 11th before making his final determination. Defendant's conduct on May 21st at that hearing shows that he really was not interested in having counsel represent him. He didn't just complain about his attorney. He was complaining about the entire system. He was complaining about the jail being subject to unnecessary lockdowns and having his phone cut off. And then he looked Judge Swift in the eye and actually were proven in court. He was insisting that he had this viable speedy trial claim, which they had decided in court and then gone over with him the fact that there were continuances that the defense counsel had to make to prepare for trial and go over discovery. So, defendant refused to acknowledge that and said that his speedy trial allegations had been in court, which was categorically false. So, both of these judges were in the best position to assess his credibility and evaluate whether his complaints were authentic or pretextual. And then there were extensive colloquies. Judge Swift went over Illinois Supreme Court Rule 401A admonishments with him. So, the question before this court isn't whether or not each of you would have reached the same conclusion, but whether a reasonable judge could have reached the conclusion made by Judge Swift. And the record here confirms the answer is unequivocally yes. Focusing on just some of the things highlighted, first of all, here by defense counsel was the timeliness factor, the eve of trial. Reese v. Nix was mentioned. Here, this wasn't a knee-jerk response. We had eight months of procedural history. We had eight months of a defendant who was obstructing two different counsels that had been appointed to him and who he was not willing to work with. And what we have to look at based on this court's determination in Belk is the conduct of the defendant in refusing to accept the counsel that was offered to him or available to him. His conduct amounted to waiver in this case. Even if we don't look at his final unequivocal response of yes, sir, when asked, if we just look at his conduct over these eight months, that alone, based on Belk, affirms that he was not willing to work with counsel and that he was waiving his right to counsel. Again, this was not an eve of trial, knee-jerk situation. This was a situation where defendant had made it impossible for either attorney to work with him. And why would he do that? In the reply brief, defendant argues that, you know, that's against my interest. Why would I sabotage a relationship with counsel? Well, this was a defendant whose back was against the wall. He had staggering evidence against him. And not only that, there was a witness tampering that had gone on. He had called the victim in this case 2,500 times to manipulate the victim into siding with him rather than testifying for the state. And so there were determinations about that that really complicated his trial, that he knew, all right, my back's against the wall here. And manufacturing procedural issues like this were really the only recourse he had. So was it a desperate set of, you know, circumstances? Yes. But, you know, defendant, you know, really didn't feel he had any other choice. Counsel, let me interject, maybe illustrate my thinking or mindset of the case at this point. Attorney Carter mentioned he was a conflict public defender. Yes. So this is not someone a full-time or part-time employee. This is someone who's appointed on a case-by-case basis. Yes. That being said, 16 years of experience. So you heard me push back on Attorney Landor's argument, sort of the subjective feelings of the defendant. He kind of struggled, was in a trap, he felt. Yet there's the 401 admonishments. He voices a clear and unequivocal invocation of his right to represent himself. All that being said, Attorney Landor has hit on something. This defendant, whether or not he's a, you know, he's a hard nut to crack, difficult guy, counsel is being paid to represent the defendant. And there might be a trend out there where public defenders feel that tough cases they get out of. That's a problem. Do you have any thoughts on that? Well, I think there's some really important distinguishing characteristics here in this case. And, you know, this is a case where defendant was, you know, making these aren't just accusations of, oh, this was just a little bit of difficulty. You know, we were frustrated. We were not able to agree on certain arguments. I mean, this was like about physical safety. This was a defendant who had, these were serious problems that bore on the physical safety and well-being of the attorney. So... Well, for sure, courts everywhere, we work around those problems with the jail staff, sheriff's office. We work through those problems. I, the core of what I'm getting to is counsel is appointed and public defenders have to earn the trust of their clients. And, you know, in this case of Perry, that attorney went back over and over and made attempts, despite the defendant not cooperating, to win that trust. Ultimately it was unsuccessful. But there is a feeling that it's the late hour of trial date, counsel ran for the hills. That's the way I read it. Well, in this case, he actually did meet with him again. And so there were two meetings. And in the second meeting, he refused to go over discovery. And then he got up and he walked out of the meeting. So there were several attempts to go over these things with defendant. And I think we also need to kind of distinguish to some of defendants claims about what defendant claimed counsel had said and what counsel actually did say when he was addressing the court regarding these issues with defendant. The counsel never stated that, yes, I advised him to go pro se, that never came out of counsel's mouth, but not true. And he never advised that he didn't care about the case, didn't give an F about defendant. These are credibility determinations the court did not adopt, the defendant made. The only thing that counsel said was that he was willing to go over defendant's concerns. You know, he said that he was willing to meet with defendant and go over his questions and concerns and go over discovery. And I actually made an attempt to do that. So, you know, his statement about, well, this is one of the most difficult defendants I've ever worked with was, you know, that didn't deter him from having, you know, attempted to go over these things and actually work with defendant in this case. Also, I think there was one other note that I had made. You know, the fact that there was an aberration of a substitution of judge, you know, again, this is a defendant manufactured situation where defendant had made things so difficult for the prior judge working on the case that we had to have a new judge come in. So, I think we have to look at all of the circumstances, not just his relationship with counsel, but his relationship with the prior judge, his accusations against the jail and, you know, feeling persecuted by his treatment in the jail. I mean, absolutely every authority in this case, defendant's against and extremely upset with. So, that sort of frames the context of what happened here with counsel and the manner in which defense counsel distinguished Belk. These are distinctions without a difference because this case involves the exact situation in Belk where you have a defendant who is opposed to the idea of working with counsel, whether it be, you know, the public defender that was offered and not currently representing or continuing to work with competent counsel. That's a distinguish without a difference. There's no difference there. Defendant had competent counsel and his manufactured issues with counsel are exactly like the situation in Belk where counsel or defendant was unwilling to accept the public defender that was offered to him and continued to continue out the trial and these delay tactics. This is a case just like Belk where you have these delay tactics over and over and over again. And there comes a point where the court needs to just make a decision. This is the defendant through his conduct, through his statements that he can't work with counsel that, you know, we're going to proceed pro se here. You know, there were thorough admonishments and there were, you know, this is not a case where the trial court abused its discretion ultimately at the end of the day based on this record. And if there are any other questions, I'd be happy to answer them. Otherwise, I will tender my time back over to defense counsel. Seeing no questions, any rebuttal, Ms. Andor? Yes, your honor. Thank you. I'd first like to respond to the state when they say that Mr. Carter did not suggest that Mr. Pettoway should go pro se. Indeed, he did suggest that it's on page R477 in the middle of the page. I'd also like to make a few other points. First about Belk. Belk went the other way for a couple of reasons. One, it concerns private counsel and it just has a the defendant in that case specifically at the time of the waiver said that he did not want the public defender. He told the jury that. And in this case, Mr. Pettoway repeatedly asserted that he wanted effective counsel. As I pointed out earlier on the same page that he says, yes, sir, he says he wants an effective counsel. And the fact that the state posits or argues that Mr. Pettoway's complaints were pretextual, his attorney filed a motion to withdraw. His attorney did not come visit him. His attorney suggested that he could go pro se. His attorney said he didn't. And those are things for Mr. Carter himself, not even things for Mr. Pettoway. I also want to characterize or look at a couple of the state's focuses about Mr. Carter or about Mr. Pettoway, different things that happened in trial. This idea that Mr. Pettoway was somehow sandbagging this issue for appeal simply does not make sense. And the state admits that themselves when they say that his speedy trial issue was meritless. They admit that he is not a sophisticated legal mind. And, you know, the fact that he kept on with this speedy trial issue after having being explained to him numerous times by several lawyers and two judges really shows that this isn't the kind of legal mastermind the state is portraying him as. The state also says that, you know, about this issue with the judge. And I want to, you know, I think that that characterization or that focus on this issue with the judge is somewhat of a distraction. The judge recused herself out of an abundance of caution. The idea that Pettoway threatened the judge came from the mouth of a jailhouse informant who was working on a deal for himself. And this, you know, facts that he shared or these allegations, they weren't even taken into consideration by the sentencing judge. And it has no bearing on whether the waiver is clear or not. So Mr. Pettoway may have been, you know, somewhat of a dramatic defendant, but that does not negate his right to effective counsel. And it does not negate the fact that he had not given a clear, unambiguous, unequivocal waiver of counsel. And the record, you know, simply does not show that. I also wanted to touch on this, the standard of review point that the state brought up. As I mentioned, you know, Belk is easily distinguishable. And the state hasn't pointed to a case where this kind of equivocal waiver that Mr. Pettoway made is held up on appeal. And most of the cases that I've cited show the opposite, that courts, you know, the trial court does the correct thing, and they take every reasonable presumption against the waiver of counsel. And as we've talked about a little, I think, you know, the substitution of judge, along with other factors made that, you know, made it kind of hasten the timeline. So I don't, I think the standard of review issue is irrelevant. And just, you know, kind of the show that the trial court did not abuse its discretion, show that the trial court said, we're not going to let you waive your counsel with these kind of equivocal responses. That's all. Thank you, Your Honors. Any questions? Okay. Thank you. The court will take this matter under advisement, and the court stands in recess.